**Larry BURNETT, Plaintiff,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Defendant.**

**No. PB–C–87–343.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Jan. 31, 1989.

See also 287 Ark. 158, 697 S.W.2d 95.

T. Martin Davis, Little Rock, Ark., for petitioner.

J. Brent Standridge, Asst. Atty. Gen., Little Rock, Ark., for respondent.

MEMORANDUM OPINION

ROY, District Judge.

The Court has received the Magistrate's recommended disposition in this matter, as well as the respondent's objection and petitioner's reply.

The petitioner filed a *pro se* petition on June 29, 1987, raising four grounds for relief. Subsequently, with leave of Court, he filed an amended petition, asserting six additional grounds for relief.

The Magistrate found merit to petitioner's contention that there is insufficient evidence to support the conviction on the charge of murder in the first degree, and therefore did not address the other points raised by petitioner. The Magistrate recommended that the writ be issued within 120 days of the filing of the District Court's Judgment unless the state (a) undertakes to retry the petitioner within that period of time, or (b) appropriately resentences petitioner for a lesser included offense.

The Court has reviewed the record and applicable law and hereby refuses to adopt the Magistrate's recommended disposition. Because of this Court's holding, the matter is hereby remanded to the Magistrate for further findings on the other points raised in the petition.

Petitioner was convicted in a jury trial of first-degree murder in the death of his thirteen-month-old son. The first-degree mur-

der charge was based upon the allegation that the petitioner, with the premeditated and deliberate purpose of causing the death, caused the death by starvation, beatings, and abuse. The Magistrate set out the governing standard in habeas review of this type of claim as being whether the record shows that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979). *Jackson* also requires that we grant deference to the Arkansas Supreme Court's rejection of this claim. *See Thomerson v. Lockhart,* 835 F.2d 1257, 1259 (8th Cir.1987).

The major issue involved in this analysis is whether there is support in the record for the jury's finding that the petitioner, with the premeditated and deliberated purpose of doing so, caused the death of his son.

Michael Davis, an emergency medical technician who was called to attend to the child on May 11, 1984, testified that the child looked "thin and dehydrated" when he arrived. He stated that the child had "an extremely distended stomach, and his eyes were—he had black marks underneath the eyes ...". He also noticed bruises up and down the child's spine when he was suctioning the child out. He noticed that his left foot and right calf had some puncture marks on the leg and underneath the puncture areas were large hematomas or bruises. He noticed the child's nose was swollen.

Dr. Mike Miller, the physician who first saw the child on May 11 at Baptist Hospital, administered life-saving procedures unsuccessfully. Afterwards, he did a full examination of the child and "found him to be very emaciated, malnourished, appearing—uh, having several bruises all over his body. Uh, he had some scrapes on—particularly my recollection—on the back and, uh, some areas that appeared to be human bites." Dr. Miller and a pediatrician suspected that the child may have been abused, and desired an autopsy.

The prosecution's fourth and fifth witnesses were Robert Bohannon and Tom Waggoner, both employees of the Pulaski County Sheriff's Department who spoke with petitioner and his wife following their child's death on May 11. As stated by the Magistrate, the petitioner's explanation of the child's physical state at the time of death was that the child previously had a hernia operation, was ill due to cutting teeth, had broken his nose in a fall while trying to stand, and had scratched himself.

According to Mr. Waggoner, Mrs. Burnett said a choking spell started the events which led to the child's death, that he had been disinterested in eating since February, when he began teething, and that he had been bitten by an older child.

Dr. Becky Williams testified that she had seen the infant twice, the last time on July 29, 1983, at which time the child exhibited good growth and development, particularly in light of his premature birth.

Dr. Donna Brown, a medical examiner at the Arkansas Crime Laboratory who performed the autopsy on the child, testified that there were multiple bruises, at least fifteen, to the face which were oval shaped in size and present over the forehead and front part of the face. Her testimony was not only graphic but critical, since she was in the best position to describe the nature and extent of the injuries as well as the cause of the death. Some of her testimony is set out below.

"The nose was very flattened and almost cauliflour [sic] in its shape. The upper and lower extremities had at least thirty bruises. Some of them were larger than an inch, others smaller. There were scratch marks to the right back of the head, also to the back side of the right lower leg.

"In addition to that the child appeared very skinny and had a very large abdomen that was very tight. Uh, it can be likened to the tightness of a drum.

"Q All right. The bruises, could you make any determination as to their age by your examination?

"A They were red-brown in coloration. This is consistent with their having been present for several days.

"Q Were there any bruises that were colored other than red-brown?

"A There were some to the outer aspects of the arms as well as to the tops of the hands. These were also reddish in coloration and were more consistent with just a few days old. The entire range of injuries characterized by bruises that could have been there as long as a couple of weeks.

"Q Doctor, was there any indication that any of these bruises had been caused either through the efforts of an EMT in a life-saving situation or a hospital injecting or inserting intravenous needles or anything like that?

"A In my opinion the ones to the hands were not in any way related to injuries that were due to venae puncture marks such as trying to start I.V. fluids in a hospital setting.

"There were some puncture wounds to the chest which would be correlated with medical intervention procedures.

"Q Doctor, did you make an examination of the child's mouth and lip area?

"A Yes, sir, I did. In addition to the nose being markedly flattened, there were bruises to the middle portion of the nose which had scab and puss. In addition, inside the mouth, called the frenulum, which is the thin membrane that attaches the lip to the gums, had extensive tears. These were created at sometime in the past. There was no immediate swelling around these and, in essence, the mucosa on the inside of the mouth was torn on the inside of the lip. But there were no bruises to the outside of the lip. ·

"Q Doctor, do you have an opinion as to what could have caused such a tearing as you have described to the jury?

"A Yes, sir, I do.

"Q What is that?

"A These type of injuries are characteristic of the child having received some blows to the mouth area such as a fist seen in a punch. Using myself as an example, blows like this, punches head-on, causing the lip to get pushed upward and downward and causing tears inside the mouth.

"Q Doctor, based on your examination, would such a damage to the mouth and, also, to the nose, would that be consistent with a child falling, say a child trying to stand up and walk to fall on the floor?

"A No, it would not. I would expect bruises on the outside of the lips if a child were to fall face forward onto the floor.

"Q Would a fall, say face forward on the floor, have sufficient force to break a nose like you have found in your examination?

"Q Uh, a straight forward fall could break a nose, naturally. But the nose was no [sic] markedly distorted and flattened, it could be likened to a face being slammed into a door.

"Q Doctor, do you have an opinion as to what caused the bruises you saw about the face and the body?

"A The bruises to the face can be [sic] seen in pinching or they can be noted in knuckling or thumping a child. The child had paper thin skin and practically no fat present which would help accentuate the bruises.

"There were also marks to the extremities, which I have previously indicated, in addition to the top part of the left foot. There was extensive bruising and swelling of the left foot as well as both lower extremities, the legs, for example. These injuries can be due to clawing or digging with fingernails.

"In addition to that, there were scrapes on the inside of the hand—on the palmer aspect of the hands—and marked bruising on the top part of the hands. This can be noted in trying to pinch and pinch deeply. There was bruising all the way through the hands to include the muscles between the fingers and the bones of the fingers.

\*   \*   \*   \*   \*   \*

"Q All right. Are the bruises visible on the forehead and around the face area?

"A Yes, they are.

"Q All right. What about the eyes? Is there anything unusual about the child's eyes?

"A  Two things are unusual.  There is some bruising, especially about the right eye, but both eyes appear sunken.  Uh, you may have seen someone who is ill of cancer and the eyes are way back deep in the sockets.  This child's eyes have that similar type of appearance.

"Q  Doctor, you testified earlier concerning some scratches and claw marks that appeared on the child's legs.  Are those marks visible in these pictures?  I show you specifically State's Exhibit No. 3.

"A  They are present on the inside of the right lower leg together with extensive bruising, and also, on the top part of the left foot.

"Q  All right.  I'll show you State's Exhibit No. 6.  Does that reflect the scratch marks or the marks that you saw?

"A  Yes, they do.

"Q  Now, you mentioned some marks, I believe, some scratch or dig marks on the head.  Where were those marks?

"A  Using myself as an example, they were on the right back of the head in this approximate vicinity of the child reflectively.

"Q  Were those marks consistent with a scratching with fingernails—

"A  Yes.

"Q  —or claw marks?

"A  Yes.

"Q  Now, doctor, did you find any evidence of injury on your internal examination of Larry Burnett, Jr.?

"A  Yes, I did.

"Q  And describe for us what you found.

"A  Upon opening the child within the right side of the chest in the back were four ribs that were broken previously. These factures were in ribs seven, eight, nine and ten, which is the lower part of the back, and they are in the back part of the child and not in the front part.  These were characterized by having callus formation, which is another term for healing process, having been apparent indicating that these fractures were not of recent origin, i.e. within the last few days.

"In addition to that the abdomen, as I previously described, was very tight.  It almost sounded like a drum thumping on it for precussion.  Upon opening the abdomen excrement material from the small and large bowel just shot forth and spewed forth from the abdomen.

"Further examination of the small bowel revealed a tear approximately an inch long in the small bowel, and surrounding this tear was some hemorrhage and some accute inflammatory cells, which are cells which come immediately to start a repairative process in someone who has sustained an injury.

"In addition to that, multiple areas of the small and large bowel were involved in various stages of a healing process.  The bowel can be thought of as a long tube.  In an adult person it can be maybe twenty-two feet long, but naturally in a child it is considerably smaller.  But on the outside is called the serosa, and when the serosa—it's a membrane—is damaged, these areas of the bowel can adhere to each other causing multitudes of loops that, in time, can cause bowel obstruction.

"It was noted by me that these regions were frequently presently throughout the region of the small bowel in addition to the tear in the particular area of the ileum, which is the more distal part or far away from the stomach, where the actual fluid from the small bowel was leaking out into the abdomen and not able to go out through the usual rectum or anus.

"Q  Doctor, these lesions or the injuring you indicated to the bowel, what would that indicate?  Or, let me ask my question another way, do you have an opinion as to the cause of these lesions or marks you saw on the bowel?

"A  The multitude of regions involved would reflect multiple prior insults to the abdomen and the small intestines.

"Q  What sort of insults?

"A.  Uh, insults characterized by a fist, a punch or multiple punches to the abdomen causing repetitive prior injuries that

would be seen by me in various stages of the healing process.

"Q Would such injuries be consistent with a CPR type life-saving approach?

"A No. Not that far down in the abdomen.

"Q Now, the tear in the small bowel was approximately how long?

"A About an inch long.

"Q Do you have an opinion as to what was the cause of that tear?

"A It would be a blunt type of injury, such as with a fist.

"Q Did you notice any bruising on the outside of the skin, the child's skin?

"A No, I did not.

"Q What would that indicate to you?

"A If I saw bruising, I could anticipate that the child walked into or was shoved into a sharp, blunt corner such as was characteristic of this—which I did not see. The tearing of the bowel is more likely that due to a shoot out of the fist creating a tear inside that would not necessarily leave a bruise on the skin. In fact, I wouldn't necessarily expect it to.

"Q Was there any problem that came along in the child as a result of this tear in the small bowel?

"A Upon the child sustaining this fluid that would normally pass out the rectum instead would be diverted to stay within the abdomen and fill up the abdomen.

"Q Okay.

"A The child, in time, would get infection over the abdomen called peritonitis, and I saw a focus of that at the region of the tear beginning to develop in the child.

"Q Doctor, could you tell in your examination of the peritonitis that was present was there any indication as to how long the peritonitis had been developing? Could you tell that?

"A It probably was less than a few hours old. The child, in addition to the injuries previously noted, was malnourished in appearance and had very little fat at all on the organs inside as well as externally noted. The child also appeared very

dehydrated and the eyes can be seen sunken in someone who is deficient in fat as well as deficient of body fluid, which is replete within this child.

"Q Based on your observations of the tear and the development of peritonitis, can you give us an estimate as to how long before the time of death this tear occurred in the small bowel?

"A. It's consistent with injury occurring two to three hours prior to death and up to maybe twelve hours, during that time period, about nine to ten hours.

"Q So, between twelve and three hours prior to death is when the injury occurred that caused this rip?

"A That's correct.

"Q Doctor, did you note any problem or any injury to a kidney or in the back of the child?

"A On the right side beneath the previously described four fractured ribs was a [sic] old bruise to the right kidney. The kidney is covered by a cortex, or a thin membrane, and there was a small bruise between this membrane and the kidney. This kidney lies right underneath the four fractured ribs that I had previously described.

"Q Could you tell approximately how old that bruise was or that injury to the kidney?

"A It's consistent with a time period of one to three months in duration.

"Q Doctor, in the course of your work in pathology have you had occasion in the past to work with and to examine children that were a subject of abuse—that had been abused?

"A Yes, I have.

"Q Did the evidence that you saw on this child, the injuries, the nature and type of injuries, were they consistent with a child who had been abused, in your opinion?

"A Yes.

"Q Could you form an opinion, based on your examination, within a reasonable de-

gree of medical certainty as to how long this pattern of abuse had continued?

"A This child appears to have sustained repetitive injuries over a period of weeks to months.

"Q Would you say approximately how many? Would that be possible?

"A It's consistent with three months or less with these occurring on repetitive bases.

"Q Doctor, you mentioned while ago that the child showed signs of malnutrition or was thin and slight. Did you see any physical cause that would keep—that would stop this child from eating and absorbing food and growing like any other normal child?

"A From a natural disease process, no, I did not, such as cystic fibrosis or some type of malabsorption syndrome whereby the mucosa or inner lining of the bowel would prevent the normal assimilation of food and nutrients. Beyond that, I saw the injuries that were chronic or had occurred previously over probably several occasions in the past that could make this child disinterested in food if offered.

"Q By disinterested what types of things, in your opinion, would make him disinterested in food?

"A Eating may have made him uncomfortable because of the repetitive injuries the child had apparently sustained to the abdomen giving him gas, giving him diarrhea, making him sick to his stomach, perhaps in vomiting.

"In addition, the bruising to the hands may have made the child—and to the rest of the body—may have made the child unwilling to participate and preferred to be by himself even if food were offered."

The Court has also reviewed the cross-examination of Dr. Brown as well as the testimony of the defense witnesses. The jury was presented with testimony of friends, relatives, and neighbors, who denied that the victim was abused by the petitioner and his wife. There was testimony presented that the child was small and frail since birth, that he had heart problems, that his broken nose was the result

of a fall, and that he had been bitten by an older child. The jury simply chose not to believe defendant's version.

Circumstantial evidence alone can sustain a conviction under Arkansas law. *See e.g., Still v. State,* 294 Ark. 117, 740 S.W.2d 926 (1987). Premediation and deliberation can be inferred from the circumstances of the case. *House v. State,* 230 Ark. 622, 324 S.W.2d 112 (1959). As also noted by the Magistrate, the requisite state of mind of premeditation and deliberation need not exist for any particular length of time. *Fields v. State,* 280 Ark. 153, 655 S.W.2d 419 (1983). The intent or state of mind is something which is not ordinarily capable of proof by direct evidence but must usually be inferred by the circumstances of the case. *See Parker v. State,* 290 Ark. 158, 717 S.W.2d 800 (1986); *Midgett v. State,* 292 Ark. 278, 289, 729 S.W.2d 410 (1987) (Hickman, J., dissenting) (court does not try to look into the "warped minds" that commit murder and circumstantial evidence usually plays a strong part in determining intent in any murder case).

The question is whether rational triers of fact could have found petitioner guilty beyond a reasonable doubt, and the Court finds that there is ample evidence from which a jury could find petitioner guilty beyond a reasonable doubt of murder in the first degree.

The testimony with respect to previous abuse certainly tends to show that the injury to the child's ruptured colon was no accident. This, in addition to the testimony that the injury must have been caused by a weapon such as a fist striking the abdomen of the child, warranted the jury in inferring that the parents weighed in their minds the consequences of their conduct before acting and struck the child with the purpose of killing him.

The Court understands the basis for the conclusions drawn by the Magistrate, as well as the deference to *Midgett v. State.* However, this Court will not invade the province of the jury in this case in light of the standard under which we are bound—

that is—whether any rational trier of fact could have found the petitioner guilty of first degree murder beyond a reasonable doubt.

Based upon the foregoing legal principles, the Court finds the Magistrate's conclusion to be contrary to the law and the evidence, and the petitioner's petition is denied insofar as it claims that the evidence was insufficient to support his first degree murder conviction. The matter is remanded to the Magistrate for a disposition of petitioner's remaining habeas claims.